**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANDREW WATERS, MARIANNE WILLIAMS, TERESA MANN, and MORIE ADAMS-GRIFFIN** individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**CONDUENT BUSINESS SERVICES, LLC, and HEALTH CARE SERVICE CORPORATION,**<br><br>Defendants. | Case No.: ____________________<br><br>**CLASS ACTION COMPLAINT**<br><br>**AND**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Andrew Waters, Marianne Williams, Teresa Mann, and Morie Adams-Griffin ("Plaintiffs"), individually, and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendants, Conduent Business Services, LLC, ("Conduent") and Health Care Service Corporation ("HCSC") (collectively "Defendants"), and allege as follows:

## INTRODUCTION

1. Plaintiffs bring this putative class action lawsuit on their own behalf and on behalf of millions of others seeking damages from those who were negligent in the handling of their sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively "Private Information") that was impacted in a cybersecurity incident involving the Defendants between October 21, 2024, to January 13, 2025 ("Data Breach").

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2. Conduent is a national provider of digital business solutions and services to various businesses across the healthcare, commercial, government, and transportation sectors ("Clients") with its principal place of business in Florham Park, New Jersey.

3. On January 13, 2025, Conduent detected that its computer servers and network were unlawfully accessed by criminal hackers. Conduent's ensuing investigation determined that an unauthorized third-party had access to its IT Network from October 21, 2024, to January 13, 2025, and was able to exfiltrate files containing sensitive Private Information belonging to a number of Conduent's Clients' customers, i.e., Plaintiffs and Class Members, in the Data Breach.

4. Plaintiffs' investigation has since revealed that the notorious ransomware organization known as Safepay targeted, accessed, and stole Plaintiffs' and Class Members' Private Information in the Data Breach. As of February 2025, Safepay had posted about the Data Breach on its dark web leak site, claiming to have stolen 8.5 terabytes of data and threatening to publish the stolen Private Information if Defendants did not comply with its ransom demand. On information and belief, Defendants did not pay a ransom, and Plaintiffs' and Class Members' Private Information stolen in the Data Breach is now published on the Safepay dark web leak site, for any nefarious actor to view, download, and use to commit identity theft and other crimes against Plaintiffs and Class Members.

5. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, date of birth, medical and health insurance information.

6. The Conduent Clients whose customers' Private Information was compromised in the Data Breach include HCSC. HCSC is the fifth largest health insurance company in the United States with licensing rights to the Blue Cross and Blue Shield name in five states.

7. Conduent provides various back-office services for HCSC such as claims administration, payment processing, and mailroom services. In order for Conduent to provide these services to HCSC, HCSC grants Conduent access to its insureds' Private Information.

8. On or around October 24, 2025—10 months after becoming aware of the Data Breach—Conduent began sending notice ("Notice Letter") to impacted individuals. A portion of those individuals were HCSC's insureds. The other Class Members whose Private Information was impacted in the Data Breach are customers of Conduent's other Clients.

9. The potential for improper disclosure and theft of Plaintiffs and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

10. Knowing the sensitive nature of the Private Information they collected, shared, and used, Defendants were obligated to safeguard that Private Information and to ensure it was protected from unauthorized third-party disclosure.

11. Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiffs and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

12. Defendants owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

13. Despite their duties to safeguard Plaintiffs' and Class Members' Private Information from unauthorized access, Defendants failed to take reasonable or adequate

precautions designed to keep Plaintiffs' and Class Members' Private Information secure, causing it to be exposed to cybercriminals in the Data Breach.

14. Defendants failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information, and HCSC failed to require such safeguards from its vendor, Conduent. Had Defendants properly monitored their and/or their vendors' IT networks, they would have prevented the Data Breach, or at the very least, discovered and prevented it sooner than they did.

15. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in their names, using their Private Information to obtain medical services and government benefits, filing fraudulent tax returns using their Private Information, and giving false information to police during an arrest.

16. Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time incurred to remedy or mitigate the effects of the Data Breach.

17. Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct, as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties, and published on the dark web.

18. Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence/negligence *per se*, breach of implied contract, breach of third-party beneficiary contract, and unjust enrichment.

## PARTIES

19. Plaintiff Waters is a citizen and resident of Gallatin County, Montana.

20. Plaintiff Williams is a citizen and resident of Gallatin County, Montana.

21. Plaintiff Mann is a citizen and resident of Gallatin County, Montana.

22. Plaintiff Adams-Griffin is a citizen and resident of Lewis and Clark County, Montana.

23. Defendant Conduent is a New Jersey corporation maintaining its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey, 07932.

24. Defendant HCSC is an Illinois corporation with its principal place of business located at 300 E Randolph St, Chicago, IL 60601.

25. Plaintiffs will seek leave of Court to amend this pleading once they learn the identity of Conduent's other Clients whose customers were impacted in the Data Breach.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants' citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

27. This Court has general personal jurisdiction over Defendant Conduent because Defendant Conduent is a New Jersey citizen with its principal place of business in this state.

28. This Court has personal jurisdiction over Defendant HCSC because Defendant HCSC has sufficient minimum contacts in New Jersey by transacting business in this state,

including contracting with New Jersey citizen Conduent for storing Plaintiffs' and Class Members' Private Information, and Plaintiffs' claims arise from that activity.

29. Venue is proper in this Court because Defendant Conduent resides in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

30. Conduent is a provider of digital business solutions and services to Clients across the healthcare, commercial, government, and transportation sectors, and maintains its principal place of business in Florham Park, New Jersey.

31. The Conduent Clients whose customers' Private Information was compromised in the Data Breach include HCSC. HCSC is the fifth largest health insurance company in the United States with licensing rights to the Blue Cross and Blue Shield name in five states.

32. Conduent provides various back-office services for HCSC such as claims administration, payment processing, and mailroom services. In order for Conduent to provide these services to HCSC, HCSC grants Conduent access to its insureds' Private Information.

33. As a condition to obtain insurance and related services, Plaintiffs and Class Members were required to entrust their sensitive and confidential Private Information to their providers, including HCSC, and through those providers, to Conduent.

34. As a condition of doing business, Conduent requires that its Clients, including HCSC, entrust it with highly sensitive Private Information belonging to their customers. In the ordinary course of receiving service from Conduent's Clients as those Clients' customers, Plaintiffs and Class Members were required to provide their Private Information to Defendants.

35. Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiffs' and Class Members' Private Information, Defendants would be unable to perform their services.

36. At all relevant times, Defendants knew they were storing sensitive Private Information and that, as a result, their system would be an attractive target for cybercriminals.

37. Defendants also knew that a breach of their systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

38. Defendants made promises and representations to individuals that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained, demonstrating an understanding of the importance of securing Private Information.

39. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

40. As a result of collecting and storing the Private Information of Plaintiffs and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs and the Class Members' Private Information from disclosure to unauthorized third parties. Defendants failed to do so, causing this Data Breach.

41. On information and belief, in addition to HCSC, a number of other Conduent Clients provided their customers' Private Information to Conduent, which Private Information was also compromised in the Data Breach. Plaintiffs will seek leave of Court to amend this

pleading once they learn the identity of Conduent's other Clients whose customers were impacted in the Data Breach.

**B. The Data Breach**

42. On January 13, 2025, Conduent detected the Data Breach. Conduent's ensuing investigation determined that an unauthorized third-party had access to its IT Network from October 21, 2024, to January 13, 2025, and was able to exfiltrate files containing Private Information of clients of Defendant's Clients' customers.

43. On or around October 24, 2025 – ten months after becoming aware of the Data Breach – Defendant Conduent issued a notice of public disclosure about the Data Breach and began sending Notice Letters to impacted individuals.

44. Plaintiffs' investigation has since revealed that the notorious ransomware organization known as Safepay targeted, accessed, and stole Plaintiffs' and Class Members' Private Information in the Data Breach.

45. As of February 2025, Safepay had posted about the Data Breach on its dark web leak site (shown in the following screenshot), claiming to have stolen 8.5 terabytes of data and threatening to publish the stolen Private Information if Defendants did not comply with its ransom demand:



46. On information and belief, Defendants did not pay a ransom, and Plaintiffs' and Class Members' Private Information stolen in the Data Breach is now published on the Safepay dark web leak site, for any nefarious actor to view, download, and use to commit identity theft and other crimes against Plaintiffs and Class Members.

47. The following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, date of birth, medical and health insurance information.

48. Despite sending purported notice to Plaintiffs and Class Members—*10 months* after the Data Breach took place—Defendants failed to inform them that the notorious Safepay cybergang was behind the Data Breach, or of crucial details like the full extent of Private Information stolen or that data's publication on the dark web. Defendants' failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

49. Defendants had obligations created by the FTC Act, HIPPA, contract, common law, and industry standards to keep Plaintiffs and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

50. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

51. The Data Breach resulted in unauthorized third-party accessing and acquiring files containing unencrypted Private Information of Plaintiffs and Class Members. Plaintiffs and Class Members' Private Information was accessed and stolen in the Data Breach.

52. Upon information and belief, Plaintiffs' Private Information, and that of Class Members, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

53. Defendants failed to take precautions designed to keep individuals' Private Information secure.

54. Due to the Data Breach, Plaintiffs and Class Members are and will remain at risk that their sensitive and confidential Private Information will continue to be sold and disseminated on the dark web and, ultimately, used illegally in the future.

55. Conduent could and should have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members, but failed to do so.

56. HCSC could and should have prevented this Data Breach by adequately supervising its vendor Conduent's cybersecurity practices to ensure they were sufficient to protect Plaintiffs' and Class Members' Private Information against unauthorized disclosure, but failed to do so.

57. Defendants' negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**C. Defendants Knew or Should Have Known of the Risk of a Cyberattack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable.**

58. Data thieves regularly target entities in the healthcare industry like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

59. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

60. In light of recent high profile data breaches at other industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

61. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.

62. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

63. Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per

breach.[2] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.

64. Indeed, cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendants have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "Entities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[3]

65. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

66. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Conduent's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[2] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last visited Aug. 25, 2025).
[3] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Aug. 25, 2025).

67. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information.

68. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

69. As healthcare entities in possession of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members because of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**D. Defendants Failed to Comply with FTC Rules**

70. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

71. In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

72. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating

someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect patient's data, like Defendants. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

76. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

77. Defendants failed to properly implement basic data security practices.

78. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards is an unfair act or practice prohibited by section 5 of the FTC Act, 15 U.S.C. § 45.

79. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of their patients; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**E. Defendants Failed to Comply with HIPAA**

80. Defendant HCSC is a covered business under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

81. Defendants are further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. See 42 U.S.C. §17921; 45 C.F.R. § 160.103.

82. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

83. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

84. HIPAA's Security Rule required and requires that Defendant HCSC do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

85. HIPAA also required and requires Defendant HCSC to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant HCSC is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

86. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

87. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to

protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says represent the industry standard for good business practices with respect to standards for securing e-PHI.

88. HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Defendant HCSC must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Defendant HCSC is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

89. Additionally, Conduent is a business associate as defined under HIPAA. 45 C.F.R. § 160.103.

90. HIPAA requires that when a covered entity, like HCSC, provides PHI to a business associate, like Conduent, the covered entity must require and ensure the business associate uses appropriate safeguards to protect electronic PHI from unauthorized disclosure. 45 C.F.R. § 164.504(e)(2)(ii).

91. As alleged herein, Defendants violated HIPAA and HITECH. They (a) failed to maintain adequate security practices, systems, and protocols to prevent data loss, (b) failed to mitigate the risks of a data breach, (c) failed to ensure the confidentiality and protection of PHI, (d) failed to require or ensure that Conduent used appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' Private Information, and (e) failed to provide the required Data Breach notice within 60 days of discovering the incident.

**F. Defendants Failed to Comply with Industry Standards**

92. As noted above, experts studying cyber security routinely identify entities in possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

93. Several best practices have been identified that a minimum should be implemented by businesses in possession of PII and PHI, like Defendants, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

94. Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

95. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

96. These foregoing frameworks are existing and applicable industry standards for a business and healthcare provider's obligations to provide adequate data security for its patients'

sensitive information. Upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**G. Defendants Owed Plaintiffs and Class Members Common Law Duties to Safeguard their Private Information**

97. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

98. Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training its employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information

99. Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

100. Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

101. Defendants owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

102. Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**H. The Data Breach Caused Plaintiffs' and Class Members' Injuries and Damages**

103. As a result of Defendants' failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering the following injuries and damages:

a. The loss of the opportunity to control how their Private Information is used;

b. The diminution in value of their Private Information;

c. The compromise and continuing publication of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in Conduent's possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect it.

***Imminent, Increased Risk of Identity Theft***

104. The unencrypted Private Information of Plaintiffs and Class Members has already been stolen, held for ransom, and publicly posted on the Safeway dark web leak page, and will end up further disseminated and sold to criminals on the dark web, as that is the *modus operandi* of hackers like Safepay that commit cyberattacks of this type, and of the other bad actors who visit websites like the Safepay leak page to obtain sensitive PII and PHI.

105. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiffs and Class Members.

106. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

107. Cyberattacks and data breaches at healthcare companies like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

108. Researchers have found that among healthcare service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.

109. Researchers have further found that at healthcare service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.

110. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other

criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

111. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

112. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

113. The value of Plaintiffs' and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

114. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

115. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

116. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as Fullz packages.

117. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone

numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

118. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, PII is valuable to identity thieves, and if they can get access to it, they will use it to, among other things, open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

119. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

120. The Social Security Administration has similarly warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[4] Such fraud may

[4] *Id.*

go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[5] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

121. Further, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[6]

122. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendants is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained that compared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market.

---

[5] *Id. at* 4.

[6] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

123. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market: "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[7]

124. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PHI/PII, *they will use it*.

125. Approximately 21% of victims did not realize their identity has been compromised until more than two years after it happened. This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.

126. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.

127. Defendants' failure to properly notify Plaintiffs and members of the Class of the Data Breach exacerbated Plaintiffs' and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

128. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim

[7] Dark Web Monitoring: What You Should Know, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

129. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

130. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

131. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[8]

132. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

[8] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 25, 2025).

133. And for those Class Members who experience actual identity theft and fraud, the GAO Report noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

***Diminution of Value of Private Information***

134. Private Information is valuable property. Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

135. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

136. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[9]

137. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.

[9] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 25, 2025).

138. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

139. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by their compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

140. The fraudulent activity resulting from the Data Breach may not come to light for years.

141. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring***

142. The Private Information stolen in this Data Breach has already been held for ransom and published on the Safepay dark web leak site.

143. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised, and the sensitive type of Private Information involved, there is

a strong probability that entire batches of stolen information will continue to be disseminated and shared on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

144. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

145. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendants' failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

146. Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay their insurance providers, including HCSC, for the provision of their services, Plaintiffs and Class Members understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security.

Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**I. Plaintiff Waters' Experience**

147. At all relevant times, Plaintiff Waters is and was a customer of HCSC.

148. As a condition of obtaining insurance coverage and related services from HCSC, Plaintiff Waters was required to entrust his Private Information to HCSC, and through HCSC, to Conduent.

149. Plaintiff Waters greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. He is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Waters stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity. Moreover, Plaintiff Waters diligently chooses unique usernames and passwords for his various online accounts.

150. Plaintiff Waters reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Waters would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

151. At the time of the Data Breach, Conduent retained Plaintiff Waters' Private Information on its systems with inadequate data security, causing Plaintiff Waters' Private Information to be accessed and stolen by Safepay cybercriminals in the Data Breach.

152. Plaintiff Waters received a Notice Letter informing that his Private Information was compromised in the Data Breach. Plaintiff Waters' Private Information was compromised in the Data Breach and stolen by Safepay cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

153. Plaintiff Waters' Private Information compromised in the Data Breach has already been misused: Safepay cybercriminals targeted Plaintiff Waters' Private Information, stole it from Conduent's systems, held it for ransom, and published the data on the Safepay dark web leak site when Defendants did not pay.

154. As a result of the Data Breach, Plaintiff Waters has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords, and other necessary mitigation efforts. This is valuable time that Plaintiff Waters would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

155. Plaintiff Waters further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

156. Due to the Data Breach, Plaintiff Waters is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity theft is

impending and has materialized, as Plaintiff Waters' and Class Members' Private Information was targeted, stolen, and disseminated on the dark web.

157. Plaintiff Waters further believes his Private Information, and that of Class Members, will continue to be sold and disseminated on the dark web for years due to the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type and visit dark web pages like the Safepay leak site.

158. Plaintiff Waters has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII/PHI with the owner of such information.

159. The Data Breach has caused Plaintiff Waters to suffer fear, anxiety, and stress, especially given that his Private Information has now been published on the dark web, and the continuing invasion of privacy and risk of identity theft he now faces as a result.

160. Plaintiff Waters has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Conduent's possession, is protected and safeguarded from future breaches

**J. Plaintiff Williams' Experience**

161. At all relevant times, Plaintiff Williams is and was a customer of HCSC.

162. As a condition of obtaining insurance coverage and related services from HCSC, Plaintiff Williams was required to entrust her Private Information to HCSC, and through HCSC, to Conduent.

163. Plaintiff Williams greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. She is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Williams stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity. Moreover, Plaintiff Williams diligently chooses unique usernames and passwords for her various online accounts.

164. Plaintiff Williams reasonably understood and expected that Defendants would safeguard her Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Williams would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

165. At the time of the Data Breach, Conduent retained Plaintiff Williams' Private Information on its systems with inadequate data security, causing Plaintiff Williams' Private Information to be accessed and stolen by Safepay cybercriminals in the Data Breach.

166. Plaintiff Williams received a Notice Letter informing that her Private Information was compromised in the Data Breach. Plaintiff Williams' Private Information was compromised in the Data Breach and stolen by Safepay cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

167. Plaintiff Williams' Private Information compromised in the Data Breach has already been misused: Safepay cybercriminals targeted Plaintiff Williams' Private Information, stole it from Conduent's systems, held it for ransom, and published the data on the Safepay dark web leak site when Defendants did not pay.

168. As a result of the Data Breach, Plaintiff Williams has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords, and other necessary mitigation efforts. Ther is valuable time that Plaintiff Williams would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

169. Plaintiff Williams further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

170. Due to the Data Breach, Plaintiff Williams is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity theft is impending and has materialized, as Plaintiff Williams' and Class Members' Private Information was targeted, stolen, and disseminated on the dark web.

171. Plaintiff Williams further believes her Private Information, and that of Class Members, will continue to be sold and disseminated on the dark web for years due to the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type and visit dark web pages like the Safepay leak site.

172. Plaintiff Williams has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals

are able to easily use the information compromised in the Data Breach to find more information him, such as her phone number or email address, from publicly available sources, including websites that aggregate and associate PII/PHI with the owner of such information.

173. The Data Breach has caused Plaintiff Williams to suffer fear, anxiety, and stress, especially given that her Private Information has now been published on the dark web, and the continuing invasion of privacy and risk of identity theft she now faces as a result.

174. Plaintiff Williams has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Conduent's possession, is protected and safeguarded from future breaches.

**K. Plaintiff Mann's Experience**

175. At all relevant times, Plaintiff Mann is and was a customer of HCSC.

176. As a condition of obtaining insurance coverage and related services from HCSC, Plaintiff Mann was required to entrust her Private Information to HCSC, and through HCSC, to Conduent.

177. Plaintiff Mann greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. She is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Mann stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity. Moreover, Plaintiff Mann diligently chooses unique usernames and passwords for her various online accounts.

178. Plaintiff Mann reasonably understood and expected that Defendants would safeguard her Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Mann would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

179. At the time of the Data Breach, Conduent retained Plaintiff Mann'ss Private Information on its systems with inadequate data security, causing Plaintiff Mann'ss Private Information to be accessed and stolen by Safepay cybercriminals in the Data Breach.

180. Plaintiff Mann received a Notice Letter informing that her Private Information was compromised in the Data Breach. Plaintiff Mann's Private Information was compromised in the Data Breach and stolen by Safepay cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

181. Plaintiff Mann's Private Information compromised in the Data Breach has already been misused: Safepay cybercriminals targeted Plaintiff Mann's Private Information, stole it from Conduent's systems, held it for ransom, and published the data on the Safepay dark web leak site when Defendants did not pay.

182. As a result of the Data Breach, Plaintiff Mann has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords, and other necessary mitigation efforts. Ther is valuable time that Plaintiff Mann would have spent

on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

183. Plaintiff Mann further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

184. Due to the Data Breach, Plaintiff Mann is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity theft is impending and has materialized, as Plaintiff Mann's and Class Members' Private Information was targeted, stolen, and disseminated on the dark web.

185. Plaintiff Mann further believes her Private Information, and that of Class Members, will continue to be sold and disseminated on the dark web for years due to the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type and visit dark web pages like the Safepay leak site.

186. Plaintiff Mann has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as her phone number or email address, from publicly available sources, including websites that aggregate and associate PII/PHI with the owner of such information.

187. The Data Breach has caused Plaintiff Mann to suffer fear, anxiety, and stress, especially given that her Private Information has now been published on the dark web, and the continuing invasion of privacy and risk of identity theft she now faces as a result.

188. Plaintiff Mann has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Conduent's possession, is protected and safeguarded from future breaches.

**L. Plaintiff Adams-Griffin's Experience**

189. At all relevant times, Plaintiff Adams-Griffin is and was a customer of HCSC.

190. As a condition of obtaining insurance coverage and related services from HCSC, Plaintiff Adams-Griffin was required to entrust his Private Information to HCSC, and through HCSC, to Conduent.

191. Plaintiff Adams-Griffin greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. He is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Adams-Griffin stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity. Moreover, Plaintiff Adams-Griffin diligently chooses unique usernames and passwords for his various online accounts.

192. Plaintiff Adams-Griffin reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Adams-Griffin would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

193. At the time of the Data Breach, Conduent retained Plaintiff Adams-Griffin's Private Information on its systems with inadequate data security, causing Plaintiff Adams-Griffin' Private Information to be accessed and stolen by Safepay cybercriminals in the Data Breach.

194. Plaintiff Adams-Griffin received a Notice Letter informing that his Private Information was compromised in the Data Breach. Plaintiff Adams-Griffin's Private Information was compromised in the Data Breach and stolen by Safepay cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

195. Plaintiff Adams-Griffin's Private Information compromised in the Data Breach has already been misused: Safepay cybercriminals targeted Plaintiff Adams-Griffin's Private Information, stole it from Conduent's systems, held it for ransom, and published the data on the Safepay dark web leak site when Defendants did not pay.

196. As a result of the Data Breach, Plaintiff Adams-Griffin's has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords, and other necessary mitigation efforts. This is valuable time that Plaintiff Adams-Griffin would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

197. Plaintiff Adams-Griffin further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

198. Due to the Data Breach, Plaintiff Adams-Griffin is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity

theft is impending and has materialized, as Plaintiff Adams-Griffin's and Class Members' Private Information was targeted, stolen, and disseminated on the dark web.

199. Plaintiff Adams-Griffin further believes his Private Information, and that of Class Members, will continue to be sold and disseminated on the dark web for years due to the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type and visit dark web pages like the Safepay leak site.

200. Plaintiff Adams-Griffin has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII/PHI with the owner of such information.

201. The Data Breach has caused Plaintiff Adams-Griffin to suffer fear, anxiety, and stress, especially given that his Private Information has now been published on the dark web, and the continuing invasion of privacy and risk of identity theft he now faces as a result.

202. Plaintiff Adams-Griffin has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Conduent's possession, is protected and safeguarded from future breaches

## CLASS ALLEGATIONS

203. Plaintiffs bring this class action on behalf of themselves and others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

204. Plaintiffs propose the following nationwide class definition, subject to amendment based on information obtained through discovery:

> All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all persons who received a Notice Letter ("Nationwide Class").

205. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as appropriate, and (c)(4), Plaintiffs bring this action on behalf of a proposed subclass of HCSC members, defined as follows, subject to amendment based on information obtained through discovery:

> All individuals in the United States who provided their Private Information to HCSC, and whose Private Information may have been compromised in the Data Breach, including all such individuals who received a Notice Letter ("HCSC Subclass").

206. The Nationwide Class and HCSC Subclass are referred to collectively herein as the "Classes."

207. Excluded from the Classes are the following individuals and/or entities: Defendants and each Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which any Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

208. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

209. **Numerosity:** Each of the Classes is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, it has been reported that the Private Information of at least 10.5 million individuals throughout the United States was compromised in the Data Breach. Upon information and belief, there are at

least thousands of members in the HCSC Subclass, making joinder of all members of the HCSC Subclass impractical.

210. **Commonality:** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

c. Whether Defendants had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

d. Whether Defendants had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

e. Whether HCSC had a duty to supervise its business associates'/vendors' data security for Private Information;

f. Whether Defendants knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

g. Whether HCSC knew or should have known of the risks to Plaintiffs' and Class Members' Private Information in Conduent's custody;

h. Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

i. Whether Conduent's data security systems prior to, during, and since the Data Breach complied with industry standards;

j. When Defendants actually learned of the Data Breach;

k. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members their Private Information had been compromised;

l. Whether Defendants violated data breach notification laws by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

m. Whether Defendants' conduct violated the FTC Act, HIPAA, and/or HITECH;

n. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

o. Whether Defendants adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

p. Whether Defendants engaged in unfair, unlawful, or deceptive practice by failing to safeguard the Private Information of Plaintiffs and Class Members;

q. Whether Defendants engaged in unfair, unlawful, or deceptive practice by concealing and/or misrepresenting Conduent's data security processes and vulnerabilities;

r. Whether Defendants were unjustly enriched by failing to provide adequate security for Plaintiffs' and Class Members' Private Information;

s. Whether Plaintiffs and Class Members are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendants' wrongful conduct;

t. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

u. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data Breach caused.

211. **Typicality:** As to each of the Classes, Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiffs' Private Information was in Defendants' possession at the time of the Data Breach and was compromised due to the Data Breach. Plaintiffs' damages and injuries are akin to those of other Class Members and Plaintiffs seek relief consistent with the relief of the Classes.

212. **Adequacy:** Plaintiffs are adequate representatives of the Classes because Plaintiffs are members of the Nationwide Class, and members of the HCSC Subclass, and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs have no conflicts of interest with the Classes. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of all the Classes.

213. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiffs and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast,

the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

214. **Manageability:** The litigation of the class claims alleged herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

215. **Ascertainability:** All members of the proposed Classes are readily ascertainable. The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Classes. Defendants have access to information regarding the individuals affected by the Data Breach, and Conduent has already provided notifications to some or all of those people. Using this information, the members of the Classes can be identified, and their contact information ascertained for purposes of providing notice.

216. **Particular Issues:** Particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between HCSC on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether HCSC breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiffs and Class Members their Private Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members; and

i. Whether Class Members are entitled to actual, consequential, statutory, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
**(On behalf of Plaintiffs and the Nationwide Class, against Conduent)**

217. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

218. Defendants required Plaintiffs and Class Members to submit, directly or indirectly, personal, confidential Private Information to Conduent as a condition of receiving insurance coverage and related services.

219. Plaintiffs and Class Members, through HCSC, provided certain Private Information to Conduent including their names, dates of birth, Social Security numbers, health information, and other sensitive information.

220. Conduent had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Conduent had duties to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

221. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Conduent.

222. Plaintiffs and Class Members had no ability to protect their Private Information in Conduent's possession.

223. By collecting and storing Plaintiffs' and Class Members' Private Information, Conduent had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

224. Conduent's duty of care obligated it to implement processes by which it could detect if that Private Information was exposed to unauthorized actors, while HCSC's duty of care obligated it to ensure Conduent's processes to detect compromises of Private Information were sufficient.

225. Conduent owed a duty to Plaintiffs and Class Members to provide data security consistent with industry standards and legal and regulatory requirements, to ensure that its systems and networks and the personnel responsible for them adequately protected Plaintiffs' and Class Members' Private Information.

226. Conduent was able to ensure that its systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and Class Members were not.

227. Conduent had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

228. Pursuant to the FTC Act, Conduent had a duty to provide adequate systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

229. Conduent breached its duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information and by failing to encrypt or timely delete the Private Information from its network systems.

230. Conduent's violations of the FTC Act as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

231. Plaintiffs and Class Members are within the class of persons the FTC Act was intended to protect.

232. The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

233. Conduent's failures to comply with the FTC Act is negligence *per se.*

234. Conduent's duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Conduent is bound by industry standards to secure such Private Information.

235. Conduent breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information from unauthorized

disclosure in the Data Breach. The specific negligent acts and omissions committed by Conduent include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its it networks and systems;

d. Failure to periodically ensure that its network systems had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information; and

f. Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

236. But for Conduent's wrongful and negligent breaches of its duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and Class Members' Private Information would not have been compromised, and Plaintiffs' and Class Members' injuries would have been avoided.

237. It was foreseeable that Conduent's failures to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Conduent given the known high frequency of cyber-attacks and data breaches in Conduent's industry.

238. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would cause them one or more types of injuries.

239. As a direct and proximate result of Conduent's negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains in Conduent's possession and subject to further unauthorized disclosures so long as Conduent fails to undertake appropriate and adequate measures to protect it.

240. As a direct and proximate result of Conduent's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

241. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II: NEGLIGENCE/NEGLIGENCE *PER SE***
**(On behalf of Plaintiffs and the HCSC Subclass, against HCSC)**

242. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

243. HCSC required Plaintiffs and HCSC Subclass Members to submit, directly or indirectly, personal, confidential Private Information to HCSC and its business associate/vendor Conduent as a condition of receiving insurance coverage and related services.

244. Plaintiffs and HCSC Subclass Members provided certain Private Information to HCSC and, through HCSC, to Conduent, including their names, dates of birth, Social Security numbers, health information, and other sensitive information.

245. HCSC had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and HCSC Subclass Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. HCSC had duties to Plaintiffs and each HCSC Subclass Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information, including requiring and ensuring their business associate/vendors handling Private Information had reasonable and appropriate data security measures and policies in place to do so.

246. Plaintiffs and HCSC Subclass Members were the foreseeable victims of any inadequate safety and security practices by HCSC or their business associate/vendor Conduent.

247. Plaintiffs and HCSC Subclass Members had no ability to protect their Private Information in HCSC's or Conduent's possession.

248. By collecting and storing Plaintiffs' and HCSC Subclass Members' Private Information, HCSC had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

249. HCSC's duty of care obligated it to require and ensure that Conduent provided data security data security consistent with industry standards and legal and regulatory requirements, and that Conduent's systems and networks and the personnel responsible for them adequately protected Plaintiffs' and HCSC Subclass Members' Private Information.

250. HCSC's duty of care further obligated it to ensure Conduent's processes to detect compromises of Private Information were sufficient.

251. HCSC was able to ensure Conduent's systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiffs and HCSC Subclass

Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and HCSC Subclass Members were not.

252. HCSC had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

253. Pursuant to the FTC Act, 15 U.S.C. § 45, HCSC had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs' and HCSC Subclass Members' Private Information.

254. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., HCSC had the further duty to implement reasonable safeguards to protect Plaintiffs' and HCSC Subclass Members' PHI from unauthorized disclosure.

255. Pursuant to HIPAA, HCSC had a duty to require Conduent implement reasonable data security measures for the PHI in its care, including by, *e.g.*, rendering the electronic PHI it maintained in a form unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

256. Additionally, pursuant to HIPAA, HCSC had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

257. HCSC breached their duties to Plaintiffs and HCSC Subclass Members under the FTC Act and HIPAA by failing to require its business associate/vendor Conduent to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and

HCSC Subclass Members' Private Information, by failing to ensure the Private Information on Conduent's system was encrypted and timely deleted when no longer needed, and by failing to provide notice to Plaintiffs and HCSC Subclass Members of the Data Breach until over 60 days after HCSC discovered it.

258. HCSC's violations of the FTC Act and HIPAA as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and HCSC Subclass Members.

259. Plaintiffs and HCSC Subclass Members are within the class of persons the FTC Act and HIPAA were intended to protect.

260. The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

261. HCSC's failures to comply with the FTC Act and HIPAA is negligence *per se.*

262. HCSC's duties to use reasonable care in protecting Plaintiffs' and HCSC Subclass Members' Private Information arose not only as a result of the statutes and regulations described above, but also because HCSC is bound by industry standards to secure such Private Information.

263. HCSC breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs' and HCSC Subclass Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by HCSC include, but are not limited to, the following:

a. Failing to require and periodically ensure that Conduent adopted, implemented, and maintain adequate security measures to safeguard Plaintiff's and HCSC Subclass Members' Private Information;

b. Failing to adequately monitor the security of Conduent's information technology

networks and systems;

c. Failure to require and periodically ensure that Conduent's network systems had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Plaintiffs' and HCSC Subclass Members' Private Information; and

e. Failing to timely notify Plaintiffs and HCSC Subclass Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

264. But for HCSC's wrongful and negligent breaches of their duties owed to Plaintiffs and HCSC Subclass Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and HCSC Subclass Members' Private Information would not have been compromised, and Plaintiffs' and HCSC Subclass Members' injuries would have been avoided.

265. It was foreseeable that HCSC's failures to use reasonable measures to protect Plaintiffs' and HCSC Subclass Members' Private Information would injure Plaintiffs and HCSC Subclass Members. Further, the breach of security was reasonably foreseeable to HCSC given the known high frequency of cyber-attacks and data breaches in Defendants' industry.

266. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and HCSC Subclass Members' Private Information would cause them one or more types of injuries.

267. As a direct and proximate result of HCSC's negligence, Plaintiffs and HCSC Subclass Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual

consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains in HCSC's and Conduent's possession and subject to further unauthorized disclosures so long as HCSC and Conduent fail to undertake appropriate and adequate measures to protect it.

268. As a direct and proximate result of HCSC's negligence, Plaintiffs and HCSC Subclass Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

269. Plaintiffs and HCSC Subclass Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT III: BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the HCSC Subclass, against HCSC)**

270. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

271. HCSC required Plaintiffs and HCSC Subclass Members to provide and entrust their Private Information to HCSC as a condition of obtaining insurance products and related services.

272. When Plaintiffs and HCSC Subclass Members provided their Private Information to HCSC, they entered into implied contracts with HCSC pursuant to which HCSC agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and HCSC Subclass Members if and when their Private Information was breached and compromised.

273. Specifically, Plaintiffs and HCSC Subclass Members entered into valid and enforceable implied contracts with HCSC when they agreed to provide their Private Information and/or payment to HCSC.

274. The valid and enforceable implied contracts that Plaintiffs and HCSC Subclass Members entered into with HCSC included HCSC's promises to protect Private Information it collected from Plaintiffs and HCSC Subclass Members, or created on its own, from unauthorized disclosures. Plaintiffs and HCSC Subclass Members provided this Private Information in reliance on HCSC's promises.

275. Under the implied contracts, HCSC promised and was obligated to (a) provide insurance coverage and related services to Plaintiffs and HCSC Subclass Members; and (b) protect Plaintiffs' and HCSC Subclass Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiffs and HCSC Subclass Members agreed to provide HCSC with payment and their Private Information.

276. HCSC promised and warranted to Plaintiffs and HCSC Subclass Members, including through their public-facing privacy documents identified above, to maintain the privacy and confidentiality of the Private Information it collected from Plaintiffs and HCSC Subclass Members and to keep such information safeguarded against unauthorized access and disclosure.

277. HCSC's adequate protection of Plaintiffs' and HCSC Subclass Members' Private Information was a material aspect of these implied contracts with HCSC.

278. HCSC solicited and invited Plaintiffs and HCSC Subclass Members to provide their Private Information as part of HCSC's regular business practices. Plaintiffs and HCSC Subclass Members accepted HCSC's offers and provided their Private Information to HCSC.

279. In entering into such implied contracts, Plaintiffs and HCSC Subclass Members reasonably believed and expected that HCSC's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, HITECH, and with industry standards.

280. Plaintiffs and HCSC Subclass Members who contracted with HCSC for insurance coverage and related services and provided their Private Information to HCSC reasonably believed and expected that HCSC would adequately employ adequate data security to protect that Private Information. HCSC failed to do so.

281. A meeting of the minds occurred when Plaintiffs and HCSC Subclass Members agreed to, and did, provide their Private Information to HCSC and agreed HCSC would receive payment for, amongst other things, the protection of their Private Information.

282. Plaintiffs and HCSC Subclass Members performed their obligations under the contracts when they provided their Private Information and/or payment to HCSC.

283. HCSC materially breached their contractual obligations to protect the Private Information it required Plaintiffs and HCSC Subclass Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to HCSC's inadequate data security measures and procedures.

284. HCSC materially breached their contractual obligations to deal fairly and in good faith with Plaintiffs and HCSC Subclass Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify Plaintiffs and HCSC Subclass Members of the Data Breach.

285. HCSC materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, by failing to otherwise protect Plaintiffs' and HCSC Subclass Members' Private Information, and/or by failing to prevent the same data security failures by its business associate/vendor Conduent that handled Private Information, as set forth *supra*.

286. The Data Breach was a reasonably foreseeable consequence of HCSC's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and HCSC Subclass Members.

287. As a result of HCSC's failures to fulfill the data security protections promised in these contracts, Plaintiffs and HCSC Subclass Members did not receive the full benefit of their bargains with HCSC, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiffs and HCSC Subclass Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

288. Had HCSC disclosed that its data security was inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, HCSC Subclass Members, nor any reasonable person would have contracted with HCSC.

289. Plaintiffs and HCSC Subclass Members would not have provided and entrusted their Private Information to HCSC in the absence of the implied contracts between them and HCSC.

290. Plaintiffs and HCSC Subclass Members fully performed their obligations under the implied contracts with HCSC.

291. HCSC breached the implied contracts with Plaintiffs and HCSC Subclass Members by failing to safeguard and protect their Private Information and by failing to provide timely or adequate notice that their Private Information was compromised in and due to the Data Breach.

292. As a direct and proximate result of HCSC's breach of their implied contracts with Plaintiffs and HCSC Subclass Members and the attendant Data Breach, Plaintiffs and HCSC

Subclass Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with HCSC.

293. Plaintiffs and HCSC Subclass Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**COUNT IV: BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class, against Conduent)**

294. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

295. Conduent entered into uniform written contracts with its Clients, including HCSC, to provide administrative and other services.

296. Conduent's contracts with its Clients included a business associate agreement required under HIPAA, requiring Conduent's Clients to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure through adequate security measures.

297. Pursuant these contracts, Conduent received from its Clients and maintained Plaintiffs' and Class Members' Private Information in the course of providing administrative and claims processing services, which it could not perform without receiving and maintaining such Private Information.

298. Pursuant to these contracts, Conduent's Clients, including HCSC, agreed to provide Conduent with compensation and Plaintiffs' and Class Members' Private Information.

299. In exchange, Conduent agreed, in part, to implement adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely notify Plaintiffs and Class Members of the Data Breach.

300. Upon information and belief, Conduent's contracts with its Clients, including HCSC, each contained a provision requiring Conduent implement and maintain reasonable security procedures and practices appropriate to the nature of Private Information Conduent collected, to protect the Private Information from unauthorized access, use, or disclosure.

301. These contracts between Conduent and its Clients, including HCSC, were made expressly for the benefit of Plaintiffs and Class Members, as Plaintiffs and Class Members were the intended third-party beneficiaries of these contracts.

302. Conduent knew that if it breached its contractual obligation to adequately safeguard its Clients' customers' Private Information, HCSC's customers—Plaintiffs and Class Members—would be harmed.

303. Conduent breached these contracts with HCSC, by, among other acts and omissions, (a) failing to use reasonable data security measures, (b) failing to implement adequate protocols and employe training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure, (c) failing to promptly or adequately notify Plaintiffs and Class Members of the Data Breach, and (d) disclosing Plaintiffs' and Class Members' Private Information to unauthorized third parties.

304. As a direct and proximate result of Conduent's breaches of these contracts with HCSC, Plaintiffs and Class Members have suffered and will continue to suffer injuries as set forth herein, and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

**COUNT V: UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class, against Conduent)**

305. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

306. Plaintiffs and Class Members conferred a benefit on Conduent by way their Private Information to Conduent as part of Conduent's business.

307. Conduent required Plaintiffs' and Class Members' Private Information to conduct its business and generate revenue, which it could not do without collecting and maintaining Plaintiffs' and Class Members' Private Information.

308. Conduent additionally benefited from Plaintiffs' and Class Members' Private Information in that it received payment from its Clients for the specific purpose of managing such data.

309. Conduent enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Conduent instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit, while receiving payment from their Clients to process, manage, and store Private Information.

310. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Conduent's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

311. Conduent failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Conduent was overpaid.

312. Under principles of equity and good conscience, Conduent should not be permitted to retain the benefit because it failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' Private Information, while profiting from that data to Plaintiffs' and Class Members' detriment.

313. Conduent wrongfully accepted and retained these benefits of Plaintiffs' and Class Members' Private Information and was enriched to the detriment of Plaintiffs and Class Members.

314. Conduent's enrichment at Plaintiff's and Class Members' expense is unjust.

315. As a result of Conduent's wrongful conduct and resulting unjust enrichment, Plaintiffs and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Conduent, plus reasonable attorneys' fees and costs.

**COUNT VI: UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the HCSC Subclass, against HCSC)**

316. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 186 above as if fully set forth herein.

317. Plaintiffs and HCSC Subclass Members conferred a benefit on HCSC by way providing, directly or indirectly, payment and their Private Information to HCSC as part of HCSC's business.

318. HCSC required Plaintiffs' and HCSC Subclass Members' Private Information to conduct their its business and generate revenue, which it could not do without collecting and maintaining Plaintiffs' and HCSC Subclass Members' Private Information.

319. The monies Plaintiffs and HCSC Subclass Members paid to HCSC included a premium for HCSC's cybersecurity obligations and were supposed to be used by HCSC, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and HCSC Subclass Members' Private Information.

320. HCSC enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and HCSC Subclass Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, HCSC instead calculated to increase its own profit at the expense of Plaintiffs and HCSC Subclass

Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and HCSC Subclass Members, on the other hand, suffered as a direct and proximate result of HCSC's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

321. HCSC failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and HCSC Subclass Members, and as a result, HCSC were overpaid.

322. Under principles of equity and good conscience, HCSC should not be permitted to retain the benefit because it failed to provide adequate safeguards and security measures to protect Plaintiffs' and HCSC Subclass Members' Private Information, which Plaintiffs and HCSC Subclass Members paid for but did not receive.

323. HCSC wrongfully accepted and retained these benefits—payment and Plaintiffs' and HCSC Subclass Members' Private Information—and was enriched to the detriment of Plaintiffs and HCSC Subclass Members.

324. HCSC's enrichment at Plaintiff's and HCSC Subclass Members' expense is unjust.

325. As a result of HCSC's wrongful conduct and resulting unjust enrichment, Plaintiffs and HCSC Subclass Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by HCSC, plus reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, on behalf of the Classes as defined herein, appointing Plaintiffs as class representatives, and appointing their counsel as class counsel;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 5, 2025

Respectfully submitted,


By: */s/: Mark K. Svensson*
Mark K. Svensson (NJ Bar No: 380202021)
**MILBERG, PLLC**
405 East 50th Street, Suite 408
New York, NY 10022
Tel: (866) 252-0878
msvensson@milberg.com

By: */s/ James E. Cecchi*
James E. Cecchi, Esq.
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

*/s/ J. Devlan Geddes*
J. Devlan Geddes
Cameron Clevidence
**GOETZ, GEDDES & GARDNER, P.C.**
35 N. Grand Ave.
P.O. Box 6580
Bozeman, MT 59771
devlan@goetzlawfirm.com
cclevidence@goetzlawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*